1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHASE JARVIS, et al.,

                Plaintiffs,

v.

K2 INC., a Delaware Corporation, and K-2
CORPORATION, an Indiana Corporation
d/b/a K2 Sports,

                Defendants.

No.  C03-1265Z

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

## INTRODUCTION

This matter came before the Court for trial on February 22, 2005, sitting without a jury.  The Plaintiffs were represented by Yale Lewis, Katherine Hendricks, and Alexa L. Shelley of Hendricks and Lewis, and Defendants were represented by Shannon L. McDougald, Jennifer E. Bell, and Ryan McBrayer of Perkins Coie.

In its September 30, 2004 Order, the Court granted partial summary judgment to Plaintiffs on their copyright infringement, breach of contract, and conversion claims against K2 Corp.  As a result of the Court's Order the issues left for trial were Lanham Act claims against both K2 Corp. and K2 Inc., vicarious copyright infringement, breach of contract and conversion against K2 Inc., and damages.

At the pre-trial conference held on February 17, 2005, the Court bifurcated the claims for trial.  The Court ordered that the claims for Lanham Act liability against Defendants K2

FINDINGS OF FACT and CONCLUSIONS OF LAW   1–

1  Corp. and K2 Inc. and the issue of damages would proceed to trial.  The Court stayed the

2  claims against K2 Inc. for vicarious copyright infringement, breach of contract, and

3  conversion.  These claims were deferred until further Court order.

4       Trial concluded on March 3, 2005, and at the conclusion of trial, the Court took the

5  matter under advisement.  The Court has considered all of the evidence submitted at trial, the

6  exhibits admitted into evidence, the deposition transcripts of Daniel Sadowsky, Debbie

7  Fuller, and Jay Barrett Willet, the testimony of witnesses at trial and the arguments of

8  counsel.  The Court being fully advised, now enters the following Findings of Fact and

9  Conclusions of Law.

10  **FINDINGS OF FACT**

11  **The Parties**

12       1.    Plaintiff Chase Jarvis is an accomplished photographer engaged in outdoor

13  sports and active lifestyle photography.  Mr. Jarvis's images have been featured in marketing

14  and advertising campaigns for leading outdoor sports companies and other major

15  corporations.  Mr. Jarvis has been a featured photographer in several photography trade

16  magazines and has been recognized internationally for his photography.

17       2.    In his business, Mr. Jarvis contracts with clients who pay a "creative fee" to

18  obtain the rights to use the images he takes during the contracted day for limited uses and

19  limited periods.  After the client's license period ends, Mr. Jarvis then licenses a percentage

20  of those images to stock photography agencies and earns a percentage of the licensing fees.

21       3.    Through December 2002, Chase Jarvis did business as Chase Jarvis Visual

22  Media, a sole proprietorship.  In 2003, he organized Plaintiff Chase Jarvis, Inc., a

23  Washington corporation.  Chase Jarvis has assigned, and Chase Jarvis, Inc. has succeeded to,

24  certain of the rights and interests of Plaintiff Chase Jarvis.  Plaintiffs Chase Jarvis and Chase

25  Jarvis, Inc. (collectively "Plaintiffs") are the plaintiffs in this action.

26

FINDINGS OF FACT and CONCLUSIONS OF LAW   2–

4.      Defendant K2 Inc. is a Delaware corporation with its principal place of business in Carlsbad, California.  K2 Inc. is a holding company for a variety of sporting goods companies, including Defendant K-2 Corporation, its wholly-owned subsidiary.

5.      Defendant K-2 Corporation ("K2 Corp.") is an Indiana corporation with its principal place of business on Vashon Island, Washington.  K2 Corp. sells sporting equipment, including skis, skates, bikes, and snowboards.  K2 Corp. has conducted its business under the name K2 Sports, and registered K2 Sports as an assumed name with the State of Indiana.

6.      K2 Corp. registered the name K2 Sports as a name under which it does business (its "d/b/a") on January 26, 2004.

7.      No "K2 Sports, a Washington Corporation" existed at any time material.

8.      K2 Corp. uses photographic images to promote and aid in selling sporting equipment.

9.      K2 Bike, Inc. ("K2 Bike") is a subsidiary of K2 Inc.

**The Agreements**

**A.      Oral Agreements**

10.     For a number of years, Mr. Jarvis had a relationship with K2 Corp. wherein Mr. Jarvis provided to K2 Corp. limited rights to use photographs he produced.

11.     The relationship with K2 Corp. was outlined in both oral and written agreements depending upon the time frame and photographs concerned.

12.     The first agreement between Mr. Jarvis and K2 Corp. was an oral agreement entered into in 1999.  Ryan Hayter, a K2 Corp. employee, and Mr. Jarvis agreed that Mr. Jarvis would travel to Vashon Island to shoot production stills of K2 athletes as they were filmed for television touring the K2 Factory (the "Factory Tour").  Mr. Jarvis and Mr. Hayter agreed on a price and Mr. Jarvis performed the shoot.

FINDINGS OF FACT and CONCLUSIONS OF LAW   3–

13.     Mr. Jarvis sent 349 slides from the Factory Tour to K2 Corp.'s advertising agency, care of K2 Sports, in May of 2000, accompanied by a delivery memorandum.  <u>See</u> Delivery Memo no. 241, Ex. 223, Second D.  This delivery memo, no. 241, dated May 5, 2000, included terms purporting to give K2 Sports unlimited use of the images for one year from the date of invoice, to require a photo credit on every use of the images, and to require a payment of $1,500 for any slides lost or damaged.  <u>See</u> <u>id.</u>  On May 4, 2000, Mr. Jarvis sent Mr. Hayter an invoice for this shoot charging $1,000 for his time, half his normal day rate of $2,000, and $120 for the film and processing.  <u>See</u> Ex. 232, JAR 000309.  As of June 8, 2001, Plaintiffs claimed 288 of these images had been returned and 61 were unreturned. <u>See</u> Ex. 11.

14.     Mr. Jarvis neither discussed nor negotiated the terms of delivery memo no. 241 with K2 Corp.

15.     On June 1, 2000, Mr. Jarvis delivered two slides of the athlete Shane Szocs which he had taken on his own time to a K2 Corp. advertising agency at the request of Eric Zerrenner, K2 Corp.'s then marketing promotions manager.  <u>See</u> Delivery Memo no. 254, Ex. 223, Second D.  The slides were accompanied by a delivery memo, no. 254, which stated that the usage was "TBD".  <u>Id.</u>  Mr. Jarvis sent an invoice for the use of these images to Eric Zerrenner charging $500 and a "trade out bike frame".  Ex. 232, JAR 000337.  A K2 bike frame retails from $400 to $1,300.  The invoice also purported to limit use to the K2 catalog and an advertisement in Freeze Magazine.  Both of these slides were later returned.  <u>See</u> Ex. 11.

16.     The Court heard no evidence about the formation of this contract (the "Szocs Agreement"), other than that the slides were delivered with a delivery memorandum and followed by an invoice.

FINDINGS OF FACT and CONCLUSIONS OF LAW   4–

1

   **B.      October 6, 2000 Written Agreement**

2      17.     The first written agreement entered into between Mr. Jarvis and K2 Corp. was

3   a Photographic Agreement dated October 6, 2000 ("2000 Agreement").  See Ex. 2.  The

4   2000 Agreement was between Chase Jarvis, a Washington sole proprietor, and K2 Sports

5   ("K2 or client"), a Washington Corporation.  The 2000 Agreement was signed "for K2" by

6   Eric Zerrenner, Marketing Promotions Manager of K2 Corp.  The 2000 Agreement licensed

7   K2 Corp. to use any images provided in its own brochures, print advertisements, trade show

8   display booths, posters, and electronically for the web for one year from the date of delivery.

9   Any external use of the images had to be negotiated prior to the use.  The 2000 Agreement

10   required each photo to read "Photo: Chase Jarvis or its equivalent" with copyright notice.

11   The 2000 Agreement contained a clause stating that "for additional terms and conditions

12   standard to the photographic image industry consult Jarvis, licensor."  Id.  The 2000

13   Agreement also contained an integration clause which provided in part: "This Agreement

14   constitutes the entire agreement of the parties as to the subject matter hereof.  This

15   Agreement may only be modified in writing signed by the parties hereto."  Id.

16      18.     The Court finds that the 2000 Agreement was a fully integrated contract that

17   could not be modified except by a writing signed by both parties.

18      19.     The 2000 Agreement specifically contemplated one photo shoot over two days

19   to be held at Copper Mountain.  The 2000 Agreement also stated that K2 Corp. would obtain

20   Mr. Jarvis's photographic services on a non-exclusive retainer for the 2000-2001 season.

21      20.     Mr. Jarvis also participated in two shoots for K2 Corp., in addition to the

22   Copper Mountain shoot, during the 2000-2001 ski season.  In February of 2001, Mr. Jarvis

23   participated in a shoot for K2 Corp.'s Gravity Tools line and in April of 2001 Mr. Jarvis

24   participated in a shoot for the K2 Women's Alliance Team.  Mr. Jarvis testified at trial that

25   both of these shoots came about as oral modifications of the 2000 Agreement.

26

FINDINGS OF FACT and CONCLUSIONS OF LAW   5–

21.    The Court finds the language of the 2000 Agreement is broad enough to encompass the Gravity Tools and Women's Alliance Team shoots without modification. The Court finds that these two shoots and the images produced at the shoots are governed by the 2000 Agreement.

22.    Mr. Jarvis delivered 2,516 original slides to K2 Corp. or its agents in connection with the 2000 Agreement.  See Ex. 11.  Each slide delivery was accompanied by a delivery memo.  See Ex. 223, Second D, Delivery Memos no. 284, no. 286A, no. 300A, no. 304, no. 305A, and no. 314.

23.    Mr. Jarvis neither discussed nor negotiated the terms of any delivery memo with K2 Corp.

24.    K2 Corp. never agreed, either orally or in writing, to the terms and conditions set forth in any delivery memo.

**C.    December 13, 2001 Written Agreement**

25.    The second written agreement was between Chase Jarvis, a Washington sole proprietor, and K2 Sports ("K2 or Client"), a Washington Corporation, and is dated December 13, 2001 ("2001 Agreement").  See Ex. 4.  The 2001 Agreement was similar to the 2000 Agreement in that it included a statement of permitted usage which excluded external use without negotiation, it required a photo credit to Mr. Jarvis for each use, contained a clause directing the reader to Mr. Jarvis for additional terms and conditions standard to the photographic industry, and contained an integration clause.  The 2001 Agreement contained a restriction on third party usage providing that "[e]xternal use of the said images by K2 for K2 marketing partners and other related promotions falls outside the scope of this agreement and must be negotiated with Jarvis prior to any use . . . ."  Id.

26.    The Court finds that the 2001 Agreement was a fully integrated contract that could not be modified except by a writing signed by both parties.

FINDINGS OF FACT and CONCLUSIONS OF LAW   6–

27.     Mr. Jarvis delivered 1,210 original slides to K2 Corp. in connection with the 2001 Agreement.  See Ex. 11.  Each slide delivery was accompanied by a delivery memo. See 223, Second D, Delivery Memos no. 410, no. 411, and no. 439.

28.     Mr. Jarvis neither discussed nor negotiated the terms of any delivery memo with K2 Corp.

29.     K2 Corp. never agreed, either orally or in writing, to the terms and conditions set forth in any delivery memo.

30.     The terms of the delivery memos conflict with the terms of the 2000 and 2001 Agreements.  The 2000 and 2001 Agreements specify that Plaintiffs' images could only be used in K2 Corp.'s own brochures, print advertisements, trade show display booths, posters, and electronically for the web.  In contrast, the delivery memos have varying usage specifications ranging from "one year to production for '01 catalog . . . unlimited joint rights with photographer" to "brochure/ad" to "one year from delivery date."  The 2000 Agreement states that invoices are payable on receipt and that payment is required within 60 days.  The 2001 Agreement states that invoices are payable on receipt.  The delivery memos state that invoices are payable on receipt and payment is required within 15 days.  The delivery memos state that loss or damage to any slide will result in a $1,500 fee per slide.  Neither the 2000 nor the 2001 Agreement contain any language regarding a $1,500 fee per slide which is lost or damaged.

### D.     Oral Agreement with K2 Bike

31.     In the summer of 2001, Mr. Jarvis entered into an oral agreement with K2 Bike to take photos on creative assignment and deliver them to K2 Bike for unlimited use for one year from the date of delivery.  On August 22, 2001, Mr. Jarvis sent 70 road cycling images to Steven Westover at K2 Bike accompanied by a delivery memorandum.  See Ex. 223, Second D, Delivery Memo no. 340.  Jarvis charged K2 Bike for the costs of the shoot, but donated his creative time.

1    32.    Mr. Jarvis neither discussed nor negotiated the terms of the delivery memo
2    with K2 Bike.

3    33.    K2 Bike never agreed, either orally or in writing, to the terms and conditions
4    set forth on delivery memo no. 340.

5    **The Missing Slides**

6    34.    Of the 349 slides sent by Mr. Jarvis to K2 Corp. or its agents in connection
7    with the Factor Tour, 288 were returned in the normal course of business by K2 Corp. or its
8    agents as of June of 2001.  See Ex. 11.

9    35.    Of the two slides sent by Mr. Jarvis to K2 Corp. in connection with the Szocs
10   Agreement, both were returned by K2 Corp. as of June of 2001.

11   36.    Of the 2,516 slides originally sent by Mr. Jarvis to K2 Corp. or its agents in
12   connection with the 2000 Agreement, 1,199 were returned in the normal course of business
13   by K2 Corp. or its agents as of October of 2001.  See Ex. 11.

14   37.    Of the 1,210 slides originally sent by Mr. Jarvis to K2 Corp. or its agents in
15   connection with the 2001 Agreement, none had been returned as of July of 2002.  See Ex.
16   11.

17   38.    Of the 70 slides originally sent by Mr. Jarvis to K2 Bike, K2 Bike had returned
18   69 as of May of 2003.  Skip Reys, then Director of Marketing and Product Development for
19   K2 Bike, acknowledged that he could only find 69 slides and e-mailed Mr. Jarvis, "I am well
20   aware of the industry standard, and you are legally entitled to the slide or $1,500."  See Ex.
21   174.  Jarvis was never compensated for this lost image.

22   39.    Debbie Fuller, K2 Corp.'s marketing director during some of the time Mr.
23   Jarvis had a contractual relationship with K2 Corp., never counted the number of images she
24   received from Plaintiffs.  Fuller Deposition at 77:lns. 5-8.  Ms. Fuller also regularly sent
25   various photographers' slides to an advertising agency.  She did not keep track of which

26

FINDINGS OF FACT and CONCLUSIONS OF LAW   8–

slides she sent, and when or if they were returned.  Fuller Deposition at 113:ln. 19 - 114:ln. 7.

40.    On May 8, 2003, Andy Luhn of K2 Corp. returned 1,992 slides to Mr. Jarvis, leaving the total number of unreturned slides, including the one slide missing from K2 Bike, at 597.  See Ex. 21.  Mr. Jarvis does not know which of these missing slides are from which particular shoot.

41.    Perkins Coie, attorneys for Defendants, returned 201 images to Hendricks and Lewis, attorneys for Plaintiffs, on November 7, 2003, leaving the total number of unreturned slides at 396.

42.    Plaintiffs maintain a set of protocols governing the delivery and return of slides.  See Ex. 130, at JAR 001459-JAR 001469.  These protocols are part of an evolving document that has changed over time.  At the beginning of the Plaintiffs' relationship with K2 Corp., Mr. Jarvis and others in his office recorded the delivery of slides to clients and clients' agents, such as advertising agencies, using a spreadsheet.  See Ex. 11.  On this spreadsheet, Jarvis and/or his assistants recorded the number of slides sent, the date they were sent, and general comments as to whom the slides were sent or what the slides were of.  The spreadsheet does not consistently provide information for every delivery as to whom the slides were sent or the slides' content.  The spreadsheet also contains the number of slides returned, the date they were returned and general comments as to who returned the slides or their content.  In the spring and summer of 2002, the protocol was updated and Mr. Jarvis and/or his assistants began photocopying every sheet of slides that was sent out of the office.  As the slides were returned, an X was put through the photocopy of the returned slide.  Only a fraction of the slides sent to K2 Corp. were photocopied.

43.    Mr. Jarvis testified that after his deposition, at the request of the defendants, he went through the returned slides to try and identify which missing slides came from which particular shoots.  While he was performing this task, Mr. Jarvis identified 439 of the slides

FINDINGS OF FACT and CONCLUSIONS OF LAW   9–

1   returned by Andy Luhn as coming from a "Belly Bomber" shoot.  Mr. Jarvis testified that he

2   had not accounted for these slides in his spreadsheet documenting slides sent to K2 Corp.

3   because these slides were sent by Benchmark 10.  Mr. Jarvis did not notify K2 Corp. that he

4   believed an additional 439 slides were missing until August of 2004.

5       44.    Benchmark 10 was an advertising agency started by Mr. Jarvis and several

6   other partners.  Benchmark 10 contracted with K2 Corp.  This work included creating

7   advertisements for K2 Corp. and consulting on K2 Corp.'s website.  Mr. Jarvis testified that

8   when he sent Plaintiffs' slides to K2 Corp. from Benchmark 10, he used a delivery

9   memorandum almost identical to the one he used when he sent slides to K2 Corp. directly.

10  Mr. Jarvis testified that he kept track of the slides Benchmark 10 sent to clients using a

11  spreadsheet system identical to the system used when he sent slides to a client.  Benchmark

12  10 dissolved in 2000 or 2001.  When Benchmark 10 dissolved, its assets, including its

13  computers, were divided among the partners.  The computers' hard drives were wiped of all

14  information.  As a result, Mr. Jarvis could not produce any evidence that the Belly Bomber

15  images were sent by Benchmark 10 to K2 Corp., other than his testimony that 439 Belly

16  Bomber images were returned to him by Andy Luhn.

17      45.    The Plaintiffs have not proved by a preponderance of the evidence that these

18  439 slides were sent by Benchmark 10 to K2 Corp.  Plaintiffs have not provided any

19  documentation or delivery memos demonstrating that these slides were delivered.  Mr. Jarvis

20  testified that it was his practice always to send a delivery memo with each delivery of slides

21  and to enter them onto his spreadsheet, yet there is no written record of any delivery of 439

22  Belly Bomber images to either Benchmark 10 or K2 Corp.  The only evidence in support of

23  the Plaintiffs' position is Mr. Jarvis's trial testimony and charts he created specifically for

24  this litigation.

25      46.    Of the 1,489 images produced as a result of Mr. Jarvis's relationship with K2

26  Corp. which he had in his possession as of October 2001 (see Findings of Fact nos. 34, 35,

FINDINGS OF FACT and CONCLUSIONS OF LAW   10–

36), seven images were licensed to Getty Images ("Getty") initially.  More images were later licensed to Corbis and Getty.  From 2002 through 2004 these seven images generated approximately $65,000 in licensing and royalty fees to Getty.  Mr. Jarvis received between 20 percent and 43 percent of this total, depending on the image licensed.  In 2002, the average royalty income per image to Getty for these images was $1,609.93; in 2003 the average was $3,540.19; and in 2004 the average was $5,257.38.  Ex. 235, Chart 3.  This is some evidence of the value of the missing slides.

47.    Approximately 11 percent of Mr. Jarvis's total body of work is licensed as stock photography either by his own office or by a stock photography company.  Approximately 1.07 percent of the images Mr. Jarvis has produced for K2 Corp. have been made available for licensing by a stock photography company.  This is some evidence of the value of the missing slides.

48.    Three of Mr. Jarvis's top ten selling images on Getty's website are images he initially produced for K2 Corp.  This is some evidence of the value of the missing slides.

49.    Plaintiffs' expert, Richard Weisgrau, testified that it is impossible to know the value of the lost slides and what their potential value in the future might be.  This is in part because Plaintiffs do not know which slides in particular are missing.  Mr. Weisgrau testified that many of Mr. Jarvis's images were timeless in nature and could generate significant income in the future.  Mr. Weisgrau also testified that perhaps 90 percent of the lost slides might have no value.  Mr. Weisgrau testified that the industry standard for payment of a lost slide is $1,500.  Mr. Weisgrau's testimony is some additional evidence of the value of the missing slides.

50.    Based on the evidence submitted at trial, the Court finds that there were 396 slides delivered by Plaintiffs to K2 Corp. that were not returned.  See Findings of Fact, nos. 34 – 41. The Court finds that while some of the missing slides were potentially very valuable and might have generated thousands of dollars in licensing fees, others would not have

FINDINGS OF FACT and CONCLUSIONS OF LAW   11–

generated any income and were of no value.  Therefore, the Court finds that a reasonable value attributable to each unreturned slide is $500.  This is also the value of the slides at the time that they were converted.

51.    The Court finds that Skip Reys of K2 Bike acknowledged that Plaintiffs were entitled to $1,500 for the one slide lost by K2 Bike.  The Court finds that one of the 396 lost slides was a slide produced for K2 Bike.  Therefore, the Court finds that the Plaintiffs are entitled to $1,500 for the loss of this slide.

52.    The total value of the unreturned images is $199,000: $197,500 for the 395 slides that cannot be conclusively identified and $1,500 for the one slide which has been identified as having been created for K2 Bike.

**The Infringements**

53.    K2 Corp.'s licenses for images created under the 2000 oral and written agreements expired one year from the date of delivery of the slides.  K2 Corp.'s licenses for images created under the 2001 Agreement ended in May 2003.

54.    In its September 30, 2004 Order, the Court held that K2 Corp. had infringed the Plaintiffs' copyright by using some of Plaintiffs' images beyond the expiration of their license.  The Court also held that K2 Corp. had infringed the Plaintiffs' copyright by providing images to third parties such as the media, K2 Corp. dealers, and K2 Corp.'s subsidiaries.  Finally, the Court held that K2 Corp. had infringed the Plaintiffs' copyright by using the Plaintiffs' images in graphic wraps that covered vehicles.  See Order, docket no. 86.

55.    The Court finds that seventy-nine (79) of Plaintiffs' images were used by K2 Corp. beyond the expiration of the license or used by a third party to which K2 Corp. had provided the image outside of the scope of the license.  See Ex. 249.  These uses had been discovered by the Plaintiffs prior to the Court's September 30, 2004 Order.  The Court finds that the image labeled Japan 5 (Ex. 249, Tab F, JAR000061) is the same as the image labeled

1   Japan 1 (Ex. 249, Tab F, JAR000064), that the image labeled Japan 11 (Ex. 249, Tab F, p.

2   21) is the same as one of the looped images which are all labeled Japan 6 (Ex. 249, Tab F,

3   pp. 9-13), and that the image labeled Japan 12 (Ex. 249, Tab F, p. 23) is the same as the

4   image labeled Japan 9 (Ex. F, JAR000058).  The Plaintiffs admit in Exhibit 249, Tab F, that

5   Japan 1 is the same as Japan 5.  The Court finds Japan 11 and Japan 12 must be identical to

6   Japan 6 and Japan 9, because Plaintiffs used Japan 6 and Japan 9 when registering the

7   copyrights they claim protect images Japan 11 and Japan 12.  See Ex. 249, Tab F; Ex. 250, p.

8   3; Ex. 5, pp. JAR001857, JAR001858.  The Court also finds, based on the Plaintiffs'

9   admission, that the image labeled Vehicle 2 #1 is the same as the image labeled Vehicle 1

10  #1.  See Ex. 249, Tab H.  Some of the images were used more than once, for example the

11  image labeled Japan 1 was used on three different web pages, once on the K2 Japan

12  homepage and twice on K2 Japan secondary pages, the image labeled FT 3 was used twice,

13  once on a homepage and once on a secondary page, and the image labeled Vehicle 2 #1 was

14  used on at least two different vehicles.  See Ex. 249, Tab C, pp. 6-7; Tab F, JAR000064, p.

15  3, JAR000061; Tab H, pp. 2, 4.  Sixty-nine (69) of the images were used exclusively online.

16  Two (2) of the images were used on graphic wraps covering vehicles.  Three (3) of the

17  images were used in print advertisements.  Three (3) of the images were used exclusively in

18  print media articles and two (2) of the images were used both in print media and online.

19       56.     The Court finds by a preponderance of the evidence that the graphic wraps

20  were used on vehicles for over one year.  The Court notes that Plaintiffs provided charts

21  which suggest that other images were used for over one year, but Plaintiffs did not provide

22  evidence from which the Court can find by a preponderance that these images were used for

23  over one year.

24       57.     K2 Corp. argues that Mr. Jarvis orally granted it a license to use the images

25  from the Gravity Tools shoot indefinitely.  The Court rejected this argument in its Order

26  dated September 30, 2004.  See Order, docket no. 86.  The Court found that the 2000 and

FINDINGS OF FACT and CONCLUSIONS OF LAW   13–

1   2001 Agreements could not be orally modified, rendering this alleged transfer inoperable,

2   even if proven.

3        58.     Plaintiffs presented evidence of six (6) additional infringing images that were

4   discovered after the Court's September 30, 2004 Order.  These images were found on the

5   Hone Designs website and on a Yahoo! Japan website.  See Ex. 249, Tab M.  The Plaintiffs

6   presented no evidence that K2 Corp. knew or should have known of these infringements or

7   caused these infringements.

8        59.     Plaintiffs registered copyrights in many of their images.  The first group of

9   images was registered on May 19, 2003, and the second group was registered on September

10   24, 2003.  See Exs. 5 and 6.

11        60.     Of the seventy-one (71) images used online and discovered by Plaintiffs before

12   the September 30, 2004 Order, Plaintiffs assert that eighteen (18) uses of these images

13   commenced after copyright registration.  Sixteen (16) of the eighteen (18) uses were in

14   advertisements created and used by K2 Corp. and/or its agents while K2 Corp. had the

15   license to use the images.  See Ex. 249.  These advertisements consist of collages of

16   photographs, some of which are Plaintiffs' images and some of which are not.  See Ex. 250.

17   FT10 is an advertisement containing seven (7) Jarvis images, all of which were registered as

18   copyrighted on May 19, 2003.  Id.; Ex. 6.  FT11 is an advertisement containing eight (8)

19   Jarvis images, four (4) of which were registered on September 24, 2003.  Ex. 250; Ex. 6.

20   SP5 is an advertisement containing six (6) Jarvis images, two (2) of which were registered on

21   May 19, 2003 and one (1) of which was registered on September 24, 2003.  Ex. 250; Ex. 5.

22   SP6 is an advertisement containing three Jarvis images, one (1) of which was registered on

23   May 19, 2003 and one (1) of which was registered on September 24, 2003.  Ex. 250; Ex. 5.

24   In total, these advertisements contained twenty-four (24) Jarvis images, sixteen (16) of which

25   were registered.  These advertisements originally appeared in print when K2 Corp. was

26   licensed to use the Jarvis images.  The advertisements later appeared in electronic form on

FINDINGS OF FACT and CONCLUSIONS OF LAW   14–

1  K2 Corp.'s Seth Pistol website and Factory Team website after the copyright registration of

2  the sixteen images.  When these advertisements appeared in electronic form, unlike in their

3  print form, they were accompanied by webpage text, including a menu at the top of the

4  webpage and a K2 Corp. copyright notice on the bottom of the webpage.  Otherwise, the

5  images were unaltered.  The use of the images was governed by the 2001 Agreement.  The

6  2001 Agreement allowed for the use of the Plaintiffs' images in K2 Corp.'s "own print

7  advertisements, trade show display booths, posters, and electronically for the web."  The

8  2001 Agreement did not prohibit the use of these images in collage advertisements.

9      61.    Two (2) of the eighteen (18) images claimed infringed after copyright

10 registration, Japan 11 and Japan 12, had been infringed prior to registration on the K2 Japan

11 website.  When registering the copyright of these two images, Plaintiffs submitted copies of

12 the images Mr. Jarvis or his associates found on the K2 Japan website.  See Ex. 5,  pp.

13 JAR001857, JAR001858, Ex. 250.  As K2 Japan never had a license to use these images,

14 labeled Japan 6 and Japan 9 in Plaintiffs' Exhibit 249, Tab F, the copies used by Plaintiffs in

15 their registration applications demonstrate that the images were used on the K2 Japan

16 website prior to registration.  In the above count of seventy-one (71) images used online,

17 these images are counted just once each.  After the copyright in these images was registered,

18 on September 24, 2003, the images were again used on different pages and in a different

19 context within the K2 Japan website.

20     62.    Getty provides images and film content to clients worldwide.  Getty maintains

21 an online databank of hundreds of thousands of images.  Clients can access Getty's databank

22 of images and purchase a license to use a particular image via Getty's website.   Images

23 made available to license on Getty's website are categorized as either "rights managed" or

24 "royalty free."  Rights-managed images are licensed on a use-by-use basis and the price for

25 each use is calculated depending on the type of use intended.  Royalty-free images may be

26

1   used multiple times in multiple projects for one fee.  Rights-managed images are generally

2   more expensive to license than royalty-free images.

3          63.     Plaintiffs' expert, Mr. Weisgrau, testified that the fair value of the license to

4   use the infringed images could be found by using Getty's website.  Mr. Weisgrau used the

5   rights-managed images at Getty to inform his calculations, because he believes

6   photographers generally look to the price of rights-managed images when pricing licenses to

7   use their images.  To calculate the value of the licenses for the infringed images, Mr.

8   Weisgrau visited the Getty website and, using Getty's online pricing scheme for licensing

9   rights-managed images, looked up the price to use an image of the type infringed for a use

10   similar to the infringing use.  Mr. Weisgrau priced the use for one month if it was an online

11   image and for one year if it was a print image.  If the image was used online, Mr. Weisgrau

12   then multiplied the price for one month times the number of months the infringing image was

13   allegedly used.  If the same image was used online on more than one page or in more than

14   one context, Mr. Weisgrau added an additional licensing fee for each different use of the

15   image online.  If the infringing use was a print use or a graphic wrap use, Mr. Weisgrau

16   multiplied the price to use the image for one year times the number of years it was allegedly

17   used.  If the image contained a K2 logo, Mr. Weisgrau multiplied the licensing fee by a

18   factor of 1.5, reasoning that K2 Corp. would pay more for an image containing its logo.  Mr.

19   Weisgrau acknowledged that the price to use an image for one year was approximately twice

20   the price to use it for one month and any reasonable business person would pay to license the

21   image on a yearly basis rather than a monthly basis if the use was for more than one month.

22   However, Mr. Weisgrau testified that he did not use the yearly price for online infringements

23   because valuing a long-term infringement at less than a short-term infringement would

24   reward the infringer.  Mr. Weisgrau's testimony and expert report are some evidence of the

25   value of the licenses for the infringed images.  This evidence would support a finding of a

26   fair market value of between $1,500 and $5,000 per license for images used online.  Because

1   Mr. Weisgrau relied almost exclusively on the Getty website for his figures and

2   unrealistically used a monthly licensing fee as the basis for his valuations of images used

3   online, the Court assigns little weight to this evidence.

4         64.    Timothy Petrick, Vice President of Sales for K2 Corp., testified that on the

5   open market he would pay between $5 and $20 to use images on K2 Corp.'s website.  Mr.

6   Petrick testified that he would pay between $500 and $750 for a high definition, glossy

7   image to be used in a print advertisement or on the cover of a magazine.  Mr. Petrick's

8   testimony is some additional evidence of the value of the licenses for the infringed images.

9         65.    The 2000 Agreement included a retainer of $10,000 for Mr. Jarvis's services

10   and the use of the images produced for a full year.  The 2001 Agreement included financial

11   compensation of $7,200, plus costs of the shoot and development, for three days of shooting

12   and use of the images produced for a full year.  This is some additional evidence of the value

13   of the licenses for the infringed images.

14         66.    In January of 2001, Mr. Jarvis licensed seven uses of Jarvis images produced

15   on Mr. Jarvis's own time to K2 Corp. for a total of $3,000.  This is an average of $428.57

16   per license.  These licensed uses included the cover of a consumer catalog, a spread in a

17   consumer catalog, the cover of a dealer catalog, a spread in a dealer catalog, and a business

18   card.  See Ex. 254.  This is some additional evidence of the value of the licenses for the

19   infringed images.

20         67.    On or about November 25, 2002, Chase Jarvis sent an invoice to K2 Corp.

21   requesting payment of $15,520 for back licenses for all of Plaintiffs' images then being used

22   without a license.  See Ex. 8.  This is some additional evidence of the value of the licenses

23   for the infringed images.  Because this was a settlement offer, the Court assigns little weight

24   to this evidence.

25         68.    The Court finds that K2 Corp. does not contest the Plaintiffs' proposed values

26   for print uses.  The Court finds that the fair market value of the use of the image labeled

1  Dealer 1 is $1,185, the fair market value of the use of the image labeled Dealer 2 is $1,778,

2  the fair market value of the use of the image labeled Catalog 1 is $1,313, the fair market

3  value of the use of the image in Article 1 is $840, the fair market value of the print use of the

4  image labeled Article 2 is $820, the fair market value of the image labeled Article 3 is $260,

5  the fair market value of the print use of the image labeled Article 4 is $1,320, and the fair

6  market value of the image labeled Article 5 is $460.  The average license for these print uses

7  is $922.

8        69.    The Court finds that the fair market value of an online use is less than the

9  average fair market value of a print use.  The Court finds that for the purpose of valuing an

10  online use it is more reasonable to use the royalty-free pricing scheme which charges one fee

11  per image regardless of how many times it is used.  Based on all of the evidence before the

12  Court as to the fair market value of a license to use an image online, the Court finds that an

13  appropriate value is one-half of the average license for K2 Corp.'s print use of the Plaintiffs'

14  images, or $461.

15        70.    The Court finds that the reasonable value of an image used in a graphics wrap

16  on a vehicle is more than the average value of a print use.  An image in a graphic wrap on a

17  vehicle is presumably large and prominently displayed in comparison to an image used in

18  print.  Based on all of the evidence before the Court as to the fair market value of an image,

19  the Court finds that an appropriate value of a license to use an image in a graphic wrap on a

20  vehicle is twice the average license for a print use or $1,844.

21        71.    In tabular form, the reasonable amount of damages to be awarded for the

22  images infringed is as follows:

23

24

25

26

FINDINGS OF FACT and CONCLUSIONS OF LAW   18–

| Image | Use | Fair Market Value | Total FMV |
|-------|-----|-------------------|-----------|
| 71 images used online (includes two images used both in print media articles and online) | online | $461 each | $32,731[1] |
| Vehicle 1, #1, two years | vehicle wrap | $1,844 | $3,688 |
| Vehicle 1, #2, two years | vehicle wrap | $1,844 | $3,688 |
| Vehicle 2, #1, two years (same image as vehicle 1, #1, but used on a different vehicle) | vehicle wrap | $1,844 | $3,688 |
| Dealer 1 | print ad | $1,185 | $1,185 |
| Dealer 2 | print ad | $1,178 | $1,178 |
| Catalog 1 | print ad | $1,313 | $1,313 |
| Article 1 | print media use | $840 | $840 |
| Article 2 | print media use | $820 | $820 |
| Article 3 | print media use | $260 | $260 |
| Article 4 | print media use | $1,320 | $1,320 |
| Article 5 | print media use | $460 | $460 |
| Total | | | $51,171 |
| Net Amount Awarded | | | **$40,107** |

## Failure to Credit and Miscredit

72.     Under the terms of both the 2000 and 2001 Agreements, K2 Corp. had an obligation to give credit to Mr. Jarvis for all uses of Plaintiffs' images.  In its September 30, 2004 Order, the Court held that K2 Corp. had breached the 2000 and 2001 Agreements by failing to credit Mr. Jarvis when it used his images.  Order, docket no. 86.

_____

[1]In the conclusions of law, the Court reduces the total number of images infringed online from 71 to 47.  See Conclusions of Law, nos. 14, 15.  This amount is accordingly reduced from $32,731 to $21,667.

FINDINGS OF FACT and CONCLUSIONS OF LAW   19–

73.     The Court finds that K2 Corp., or entities to which K2 Corp. provided the Plaintiffs' images, failed to provide credit on one-hundred five (105) uses of the Plaintiffs' images. K2 Corp. miscredited one (1) of Plaintiffs' images to another photographer. Seventy-five (75) of the failures to credit occurred on images that were also used outside of the terms of the license. Thirty-two (32) of these failures to credit occurred in relation to images that were used within the terms of K2 Corp.'s license.

74.     Sixty-eight (68) of the failures to credit and the one miscredit were in connection with online use, three (3) of the failures to credit were in connection with vehicle wrap use, thirty (30) of the failures to credit were in connection with print advertisements, and four (4) of the failures to credit were in connection with media use.

75.     Mr. Jarvis gets some of his new assignment work, where a client hires him to go on location and shoot photographs of its products, when his images are seen in print or online. One of the ways a client who may potentially hire Mr. Jarvis can determine who took his photographs is through a photo credit.

76.     Many of the images for which Mr. Jarvis did not receive photo credit are very small images which appeared online. It is difficult to make out the content and quality of these images. Many of these images are simply filler on a webpage, and a photo credit for such images would have little, if any, value.

77.     Three of the instances in which Mr. Jarvis did not receive photo credit appeared on vehicles in the form of a graphic wrap. The Court find that unless the photo credit was large and prominently placed, a photo credit on the side of a vehicle would not be very valuable as it would be difficult to see, particularly if the vehicle were in motion. However, as a vehicle by nature travels frequently, an easy-to-read photo credit on a vehicle would be valuable as it would be widely seen.

78.     Plaintiffs' expert, Mr. Weisgrau, testified that he cannot estimate the actual value of a missing credit in print or on the web. However, based on his knowledge of the

FINDINGS OF FACT and CONCLUSIONS OF LAW   20–

industry, Mr. Weisgrau testified that it is industry standard for photographers to charge three times the licensing fee for a failure to credit.

79.     The Court finds the reasonable value of a failure to credit an image is $50 for an online use, $100 for a vehicle wrap use, $200 for a print advertisement use, and $300 for a media use.  The Court reasons that photographic credit for online uses, particularly on a K2 Corp. website whose intended audience is potential K2 Corp. customers and where many of the images which lack credit are very small and difficult to identify, would yield little in the way of new work for Mr. Jarvis.  In contrast, photographic credit in a print advertisement or a media use could potentially result in new assignment work for Mr. Jarvis.  The Court finds, however, that assigning a value to the failure to credit of three times the licensing fee is unreasonable.

80.     The Court finds that a miscredit does more damage than a failure to credit.  A miscredit may send potential clients who are interested in Mr. Jarvis's work to a competing photographer.  However, the miscredit in this case occurred on a K2 Corp. website, which is less likely to lead to new assignment business for Mr. Jarvis.  Therefore, the Court finds that the miscredit in this particular case has a value of $500.

81.     Thus the total value of the failure to credit may be tabulated as follows:

| Number of Failures/Miscredits | Type of Use | Damages | Total Damages |
| --- | --- | --- | --- |
| 68 | Online | $50 per failure | $3,400 |
| 3 | Vehicle wrap | $100 | $300 |
| 30 | Print Advertisements | $200 per failure | $6,000 |
| 4 | Media Use | $300 per failure | $1,200 |
| 1 | Online Miscredit | $500 | $500 |
| | | | $11,400 |

FINDINGS OF FACT and CONCLUSIONS OF LAW   21–

1   **Plaintiffs' Efforts to Obtain Compliance and K2 Corp.'s Response**

2       82.     Mr. Jarvis made repeated attempts to inform K2 Corp. that it was infringing

3   Plaintiffs' copyrights by displaying Plaintiffs' images.  On October 8, 2002, Mr. Jarvis sent

4   an e-mail to Andy Luhn informing him of a number of photo uses by K2 Corp. that Mr.

5   Jarvis believed were in violation of K2 Corp.'s license.  <u>See</u> Ex. 19.  Mr. Jarvis did not give

6   a complete list, but made clear that he wanted to speak with Mr. Luhn by phone about this

7   issue.  When Mr. Luhn did not respond, Mr. Jarvis followed up with a second e-mail.  Mr.

8   Luhn responded on October 11, 2002, told Mr. Jarvis that K2 Corp. would pull all of his

9   images, and asked for help identifying the images.  <u>See id.</u>  Mr. Jarvis followed up this e-

10  mail with a phone call to discuss the issue in more detail, but his phone call went unreturned.

11      83.     On or about November 25, 2002, Mr. Jarvis sent Mr. Luhn a letter detailing a

12  number of alleged uses of Plaintiffs' images that violated K2 Corp.'s license and the terms of

13  the 2000 and 2001 Agreements.  <u>See</u> Ex. 8.  Mr. Jarvis sent an invoice with this letter

14  requesting payment of $15,520 in back license fees for K2 Corp.'s unlicensed use of

15  Plaintiffs' images.  Mr. Jarvis e-mailed Mr. Luhn on December 12, 2002, asking if Mr. Luhn

16  intended to pay the requested back license fee.  <u>See</u> Ex. 20.  Mr. Luhn did not respond.

17      84.     On January 22, 2003, Timothy Foster, then counsel to Mr. Jarvis, sent Mr.

18  Luhn a letter detailing alleged copyright infringements and estimated damages for each

19  infringement.  <u>See</u> Ex. 9.  The letter solicited proposals regarding settlement.

20      85.     From October of 2002 through March of 2003, Mr. Jarvis received no response

21  to his repeated phone calls to K2 Corp. seeking to resolve the issue of K2 Corp.'s copyright

22  violations.

23      86.     On April 3, 2003, after having received no response from Mr. Luhn at K2

24  Corp., Mr. Jarvis sent a fax to Anthony DeRocco, attaching the letter sent by Mr. Foster to

25  Mr. Luhn.  Ex. A-34.  Plaintiff re-sent the fax on April 7, 2003 to a different fax number at

26

1    Mr. DeRocco's request.  Mr. DeRocco subsequently left a message for Mr. Jarvis on his

2    work voice mail, which, in part, referred to his request for back licenses as "a joke."

3           87.    At all times material, K2 Corp. did not have in place any tracking system for

4    accounting for slides or keeping track of which slides in its possession belonged to a

5    particular photographer.  K2 Corp. did not have any formal protocol or system for ensuring

6    that it had the rights to use images it posted on its various websites.  K2 Corp. did not have

7    any formal protocol or system for ensuring that it gave photographic credit each time it used

8    a photographer's image.  Instead, K2 Corp. relied on the skill and integrity of the individuals

9    within the marketing department to ensure that slides were kept organized, licenses were

10   respected, and credit was given.

11          88.    Debbie Fuller regularly sent CDs containing promotional materials for K2

12   Corp. to K2 Japan and other K2 Corp. international subsidiaries.  These promotional

13   materials contained images from different photographers, including Mr. Jarvis.  Ms. Fuller

14   did not keep track of the CDs she sent to K2 Japan or others.  The CDs contained no

15   restrictions on use of the promotional materials or the images within the promotional

16   materials.  See Fuller Deposition at 47:ln. 11 - 48:ln. 24.

17          89.    At all times material, Ms. Fuller believed that K2 Corp. had the unlimited right

18   to use and distribute all images in its possession as long as K2 Corp.'s use, and the use of

19   those to whom it distributed the images, was to promote K2 Corp. products.  See Fuller

20   Deposition at 56:lns. 12-25.

21          90.    On January 26, 2004, the Court entered an Order granting Plaintiffs' motion

22   for a preliminary injunction.  The Court ordered the Defendants to stop using each and every

23   Jarvis image and remove each and every Jarvis image from all locations.  Some of the Jarvis

24   images could be found on K2 Corp.'s website months after the Court issued this preliminary

25   injunction.  The image labeled Sports 7 could be found on the K2 Corp. website on May 26,

26

FINDINGS OF FACT and CONCLUSIONS OF LAW   23–

2004, and the images labeled Japan 7, Japan 8, Japan 9, and Japan 10 could all be found on the K2 Japan website on June 10, 2004.  <u>See</u> Ex. 249.

91.     On or about March 15, 2004, the president of K2 Corp., Robert Markovitz, directed all employees to stop using each and every Jarvis image; remove each and every Jarvis image from all locations; and instruct every third party to whom K2 had loaned, assigned, or permitted to use any Jarvis images to stop using these images.

92.     In the winter and spring of 2004, K2 Corp. instructed Alison Feary, its internet services manager, five or more times to ensure that K2 Corp. had the right to use the images it displayed on its website.  K2 Corp. also instructed its subsidiaries to ensure that they had the right to use the images they displayed on their websites.  Despite these instructions, and in part due to K2 Corp.'s lack of a formal protocol or system to ensure that it had the rights to use the images, K2 Corp. and its subsidiaries did not promptly remove all of the infringing images from their websites.

93.     In August and/or September of 2004, K2 Corp. sent letters to all of its dealers asking them to stop using Jarvis images they may have obtained from the K2 Corp. Dealer Tools website.  <u>See</u> Ex. 225.  In this letter, K2 Corp. acknowledged that after the injunction, it had made Jarvis images available on its Dealer Tools website and that some dealers had used these images.  The Dealer Tools website is a password-protected site available to K2 Corp. dealers, where they can log on and obtain pre-designed K2 advertisements and K2 logos for use in their advertising campaigns.

**<u>K2 Corp.'s Profits</u>**

94.     The Plaintiffs have not presented any facts which create a causal connection between the infringing uses of their images and K2 Corp.'s profits.

## <u>CONCLUSIONS OF LAW</u>

1.     This Court has original and exclusive subject matter jurisdiction of Plaintiffs' copyright infringement claims under 17 U.S.C. § 501 and 28 U.S.C. §§ 1331 and 1338(a).

FINDINGS OF FACT and CONCLUSIONS OF LAW   24–

2.      This Court has subject matter jurisdiction of Plaintiffs' Lanham Act claims under 28 U.S.C. § 1338(b), as this claim is substantially related to the claims under the Copyright laws of the United States.

3.      This Court has supplemental jurisdiction of Plaintiffs' state law claims for breach of contract and conversion under 28 U.S.C. § 1367(a).

4.      The Court incorporates by reference its Order of September 30, 2004, docket no. 86.

5.      The Court incorporates by reference its Order of December 21, 2004, docket no. 129.

6.      The Court incorporates by reference its Minute Order of February 2, 2005, docket no. 130, ruling in part on the Plaintiffs' motions in limine.

7.      The parties agree that the transactions in this case are governed by Washington's version of the Uniform Commercial Code ("U.C.C.") Article 2, Wash. Rev. Code § 62A.2-201, et seq.  Whether an agreement is fully integrated under the U.C.C. is a question of fact.  Emrich v. Connell, 105 Wash. 2d 551, 556 (1986).  Modification of an integrated agreement under the U.C.C. does not require additional consideration, but does require mutual assent.  Wash. Rev. Code § 62A.2-209; Alaska Pacific Trading Co. v. Eagon Forest, 85 Wash. App. 354, 360 (1997).  Silence does not constitute assent to the modification of a contract.  Alaska Pacific, 85 Wash. App. at 360.  Contracts which are fully integrated and specifically exclude modification except by a writing separately signed by both parties can only be modified by a writing signed by both parties.  Wash. Rev. Code § 62A.2-209(2).

8.      The Court finds that the 2000 and 2001 Agreements were fully integrated contracts.  All of the delivery memorandum and invoices sent by Plaintiffs in connection with these written agreements were proposals for modification.  Neither K2 Corp. nor any of its representatives signed any of the delivery memos or invoices or orally agreed to their

FINDINGS OF FACT and CONCLUSIONS OF LAW   25–

terms.  The delivery memos and invoices did not modify these contracts.  Therefore, any slides delivered under these contracts were not subject to the liquidated damages clause contained in the delivery memos.  The 2000 Agreement included all slides produced during the Gravity Tools shoot and the Women's Alliance Team shoot.

9.     The Court finds that under Wash. Rev. Code § 62A.2-207, the delivery memo sent with the Factory Tour images may have added additional terms to the oral contract governing that shoot, including a $1,500 fee per image lost.  However, the Plaintiffs have not proved by a preponderance of the evidence how many of the Factory Tour images were ultimately not returned.

10.     The Court finds that all of the slides delivered under the oral Szocs Agreement were returned to the Plaintiffs and it is unnecessary to analyze whether the delivery memos and invoices were part of this agreement.

11.     The Court finds that damages for the missing slides are $199,000.  See Finding of Fact no. 52.

12.     To be liable for contributory infringement, a defendant must have had knowledge of the third party's infringing activity and induced, caused or materially contributed to the third party's infringing conduct.  Ellison v. Robertson, 357 F.3d 1072, 1076 (9th Cir. 2004) (quoting Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir. 1971)).  In the context of contributory infringement, knowledge means that the defendant either knew or had reason to know of the infringing activity.  A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1020 (9th Cir. 2001).  The Court finds that K2 Corp. neither knew nor had reason to know of the infringing conduct of Hone Design in using five of the Plaintiffs' images or of a Japanese Yahoo! Stores website in using one of the Plaintiffs' images.  Therefore, K2 Corp. is not liable for contributory infringement of these six images.

13.     In order to recover damages in a copyright case involving indirect profits, the plaintiff must demonstrate that the infringing acts had an effect on profits before indirect profit damages can be recovered.  Mackie v. Rieser, 296 F.3d 909, 914-15 (9th Cir. 2002). The Plaintiffs have not demonstrated any causal link between K2 Corp.'s infringing acts and its profits.  See Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 711-12 (9th Cir. 2004). Therefore, the Plaintiffs are not entitled to any of K2 Corp.'s profits.

14.     A "collective work" is "a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole."  17 U.S.C. § 101.  The sixteen images Plaintiffs claim were infringed after copyright registration were used by K2 Corp. in collage advertisements which constitute collective works.  Under 17 U.S.C. § 201(c), "[i]n the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series."  The existence of a contract limiting the duration of usage of a work underlying the collective work does not alter the owner of the collective work's right to reproduce and distribute the collective work or any revision of the collective work.  See Faulkner v. National Geographic Soc'y, 294 F. Supp. 2d 523, 531 n.30, 542-43 (S.D.N.Y. 2003) (finding that electronic reproduction of photographs within magazines fell within ambit of Section 201(c) even though some of the plaintiffs had only granted one-time use of their photographs), aff'd in part, rev'd in part by, Faulkner v. Mindscape, Inc., __ F.3d __, 2005 WL 503652, *11 (2d Cir. March 4, 2005) (reversing as to seven photographs where the contracts expressly denied electronic rights, affirming as to the remainder of the photographs).  Additionally, the transfer of a work from one media to another, in this case from print form to electronic form,

1    does not generally alter its character for copyright purposes.  Faulkner v. Mindscape, Inc., __

2    F.3d __, 2005 WL 503652, *11 (2d Cir. March 4, 2005).

3        15.    "'Revision' denotes a new 'version,' and a version is, in this setting, a 'distinct

4    form of something regarded by its creator or others as one work.'"  New York Times Co.,

5    Inc. v. Tasani, 533 U.S. 483, 500 (2001) (quoting Webster's Third New International

6    Dictionary 1944, 2545 (1976)).   The only differences between the online presentation of the

7    advertisements identified as SP5, SP6, FT10, and FT11 and the advertisements as found in

8    print form are their size, the media in which they are presented, and the webpage text

9    surrounding the advertisements.  The actual configuration of the advertisements themselves

10   are unaltered.  The advertisements as presented online are revisions of the advertisements as

11   presented in print form.  K2 Corp. had the right to publish the advertisements SP5, SP6,

12   FT10 and FT11 online on the Seth Pistol and Factory Team websites under 17 U.S.C.

13   201(c).  Therefore, K2 Corp. did not infringe the twenty-four Jarvis images in these

14   advertisements when it posted them on its website.  This reduces the total number of online

15   infringements from seventy-one (71) to forty-seven (47).

16       16.    The owner of an infringed work has the right to elect statutory damages and is

17   eligible for attorneys' fees if the infringement commenced after registration of the

18   copyrighted work or within three months of the first publication of an unregistered

19   copyrighted work.  17 U.S.C. §§ 412, 504.  "Commencement of infringement" means "the

20   first act of infringement in a series of on-going separate infringements" of one copyrighted

21   work.  Mason v. Montgomery Data, Inc., 741 F. Supp. 1282, 1286 (S.D. Tex. 1990); see also

22   Whelan Associates, Inc. v. Jaslow Dental, 609 F. Supp. 1325, 1331 (D.C. Pa. 1985).  A new

23   infringement does not commence every time an infringer uses the copyrighted work.  See

24   Johnson v. University of Virginia, 606 F. Supp. 321, 324-25 (D.C. Va. 1985).  Plaintiffs

25   claim a total of eighteen images were infringed after registration.  The Court concluded in

26   Conclusion on Law no. 15 that sixteen of these eighteen images were not infringed because

FINDINGS OF FACT and CONCLUSIONS OF LAW   28–

they were displayed as part of collective works.  <u>See</u> Conclusion of Law, no. 15.  The two remaining images that Plaintiffs claim were infringed, Japan 11 and Japan 12, were used before registration.  Japan 11 is the same image as one of the looped images which are all labeled Japan 6 and were used on the K2 Japan website in the spring of 2003.  <u>See</u> Finding of Fact no. 61.  Japan 12 is the same as the image labeled Japan 9 which was used on the K2 Japan website in the spring of 2003.  <u>See</u> <u>id.</u>  The infringement of the images labeled Japan 11 and Japan 12 commenced when they were first used on the K2 Japan website in the spring of 2003, prior to registration in September of 2003.  Subsequent uses of these images on the K2 Japan website after registration did not commence a new infringement.

17.  None of the infringements in this case commenced after copyright registration.  Therefore, the Plaintiffs are not entitled to elect statutory damages or to obtain attorneys' fees on their copyright infringement claims.

18.  Plaintiffs are entitled to actual damages for copyright infringements that commenced prior to copyright registration.  17 U.S.C. § 504(b).  The Court finds that as a result of the reduction in infringements from seventy-one (71) to (47), the Plaintiffs are entitled to $21,667 in damages for online copyright infringements.  <u>See</u> Finding of Fact no. 71.  Plaintiffs are entitled to a total of $40,107 in damages for copyright infringements.

19.  Prejudgment interest is available under the Copyright Act of 1976.  <u>Polar Bear Prods.</u>, 384 F.3d at 716.  In a case of indisputable copyright infringement, "prejudgment interest may be necessary to discourage needless delay and compensate the copyright holder for the time it is deprived of lost profits or license fees."  <u>Id.</u> at 718.  In this case, there has been indisputable copyright infringement and prejudgment interest is necessary in order to compensate the Plaintiffs for the time they were deprived of their licensing fees.  The Plaintiffs are entitled to prejudgment interest running from the date the complaint was filed, May 9, 2003, to the date of this order, at the same rate as post-judgment interest, 3.28%, for a total prejudgment interest of $2,674.17.

FINDINGS OF FACT and CONCLUSIONS OF LAW   29–

1    20.    The Plaintiffs are entitled to reasonable costs under the Copyright Act.  17

2    U.S.C. § 505.

3    21.    The Visual Artists Rights Act ("VARA"), 17 U.S.C. § 106A, is a 1986

4    amendment to the Copyright Act which endows the author of a work of visual art with the

5    right to credit for authorship of the work.  According to 17 U.S.C. § 301(f)(1) "all legal or

6    equitable rights that are equivalent to any of the rights conferred by section 106A with

7    respect to works of visual art . . . are governed exclusively by section 106A."  In order for a

8    photograph to be a work of visual art under the Copyright Act, it must be either: (1)

9    produced for exhibition purposes only, (2) existing in a single copy that is signed by the

10   author, (3) or in a limited edition of 200 copies or fewer that are signed and consecutively

11   numbered by the author.  17 U.S.C. § 101.  The Plaintiffs' images at issue in this case were

12   not produced for exhibition purposes, they do not exist in a single copy signed by Mr. Jarvis

13   or in a limited edition of 200 copies or fewer signed and consecutively numbered by Mr.

14   Jarvis.  Therefore, VARA is inapplicable and does not preempt Plaintiffs' Lanham Act

15   claims.

16   22.    In order to prevail on a Section 43(a) Lanham Act claim of reverse passing off,

17   a plaintiff must prove: (1) that the work at issue originated with the plaintiff; (2) that the

18   origin of the work was falsely designated by the defendant; (3) that the false designation of

19   origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the

20   defendant's false designation of origin.  Lipton v. Nature Co., 71 F.3d 464, 473 (2d Cir.

21   1995).  The Plaintiffs have not demonstrated that the alleged false designation of origin was

22   likely to cause consumer confusion or that the Plaintiffs were harmed by the alleged false

23   designation of origin.  Therefore, the Plaintiffs' Lanham Act claims fail.

24   23.    "For the Lanham Act to apply to a copyright-based claim, an aggrieved author

25   must show more than a violation of the author's copyright protected right to credit and profit

26   from a creation.  The author must make a greater showing that the designation of origin was

1   false, was harmful, and stemmed from 'some affirmative act whereby [defendant] falsely

2   represented itself as the owner.'"  Weber v. Geffen Records, Inc., 63 F. Supp. 2d 458, 463

3   (S.D.N.Y. 1999) (quoting Lipton, 71 F.3d at 473-74).  The Plaintiffs have not made a

4   showing of any affirmative act whereby Defendants falsely represented themselves as the

5   owners of the images beyond a failure to credit.  Therefore, the Plaintiffs' Lanham Act

6   claims fail.

7          24.    Under Washington law, "the measure of damages in conversion is the value of

8   the article converted at the time of the taking."  Junkin v. Anderson, 12 Wash. 2d 58, 63

9   (1941).

10         25.    Under Washington law, a breach of contract requires an award of damages

11  sufficient to place the injured party in as good a position pecuniarily as it would have been in

12  had the contract been performed.  Mason v. Mortgage Am., Inc., 114 Wash. 2d 842, 849

13  (1990).

14         26.    The Court finds that under either Washington contract law or the law of

15  conversion, the Plaintiffs are entitled to $199,000 in damages for the loss of three-hundred

16  ninety-six (396) of Plaintiffs' slides.

17         27.    The Court finds that under Washington contract law, the Plaintiffs are entitled

18  to $10,900 for K2 Corp.'s failure to credit Plaintiffs' images and $500 for K2 Corp.'s

19  miscredit of one of Plaintiffs' images.

20         28.    Under Washington law, prejudgment interest is allowable "(1) when an amount

21  claimed is 'liquidated' or (2) when the amount of an 'unliquidated' claim is for an amount

22  due upon a specific contract for the payment of money and the amount due is determinable

23  by computation with reference to a fixed standard contained in the contract, without reliance

24  on opinion or discretion."  Prier v. Refrigeration Eng'g Co., 74 Wash. 2d 25, 32 (1968).  The

25  Plaintiffs are not entitled to liquidated damages and the amount of unliquidated damages due

26

1   is not computed in reference to a fixed standard contained in the contract.  Therefore, the

2   Plaintiffs are not entitled to prejudgment interest on their contract or conversion claims.

3           29.     Plaintiffs are entitled to recover judgment against K2 Corp. in the total amount

4   of $253,181.17.  The total amount consists of $40,107 in actual damages for copyright

5   infringement with $2,674.17 in prejudgment interest, $199,000 in damages for the loss of

6   Plaintiffs slides, and $11,400 in damages for K2 Corp.'s failure to credit and miscredit.

7   Plaintiffs are also entitled to judgment of costs under 17 U.S.C. § 505 together with taxable

8   costs.

9           30.     Plaintiffs shall serve and file a proposed judgment by May 10, 2005.

10   Defendants shall file any objections to the proposed judgment by May 19, 2005.

11

12           DATED this 26th day of April, 2005.

13

14           _____

15           Thomas S. Zilly
            United States District Judge

16

17

18

19

20

21

22

23

24

25

26

FINDINGS OF FACT and CONCLUSIONS OF LAW   32–